# In The United States District Court For The Western District Of Pennsylvania

Petition For Writ Of Habeas Corpus (Persons in state custody)

James Franklin Rodgers
VS.
Gerald Rozum
and
The District Attorney Of Blair County
and
The Attorney General Of The Commonwealth Of Pa.

Case No. 06-46J

RECEIVED FEB 27 2006 CLERK, U.S. DISTRICT COURT WEST. DIST. OF PENNSYLVANIA

James Franklin Rodgers Bm-3819
State Correctional Institution Somerset
1600 Walters Mill Road
Somerset Pa, 15510

**AND NOW**, comes the petitioner James F. Rodgers pro se, who files this petition for Writ Of Habeas Corpus pursuant to 28 U.S.C. § 2254 and states the following:

The petitioner plead Not Guilty in the Court of Common Pleas of Blair County to the charges of First degree murder, robbery, aggravated assault, and simple assault, criminal action No 590 (A+A-2) 1988. The petitioner took a trial by jury, was convicted and sentenced on April 3, 1991 by Judge Ellis Van Horn to life without parole, two terms of 5-10 and one term of 2-6 to run concurrently with the life.

On 5-1-91 petitioners trial lawyer appealed to the Superior Court on behalf of the petitioner docket No. 818, the sentence was affirmed on Feb. 26, 1991, a motion for reargument was filed and denied on May 1, 1991, a petition for allowance of appeal in the Supreme Court docket No. 272 was denied on Oct. 29, 1992

On May 14, 1994 the petitioner filed a P.C.R.A on June 22, 1997 the court set forth its opinion and order dismissing all the petitioners claims except one without a Evidentriary Hearing. Approx nine (9) years later on Mar. 21, 2003 a Evidentriary Hearing was held on the unruled on issue. Then on May 19, 2003 the court set forth its opinion headed "Supplement to our opinion and order of June 27, 1997" in this opinion the court dismissed the unruled on issue in turn dismissing the petitioners P.C.R.A in total.

A appeal was filed in the Superior Court, however before a ruling could be reached the petitioner was appointed a new lawyer (his 5th P.C.R.A lawyer) who filed a motion to remand the appeal for further review on May 10, 2004 docket No. 1141 WDA 2003, on May 14, 2004 the Superior Court denied this motion, and on July 13, 2004 the Superior Court denied the petitioner relief on his appeal. Allowance of appeal in the Supreme Court was denied on Feb. 24, 2005 dock. No 555 WAl 04

In Jan of 1995 the petitioner filed a second P.C.R.A claiming ineffective assistance of trial counsel, and his P.C.R.A counsel for failing to raise all the petioners claims. Because the petitioner was represented by counsel no action was taken on this P.C.R.A. On Feb. 27, 2005 the petitioner filed a third P.C.R.A claiming ineffective assistance of counsel against trial counsel, his P.C.R.A counsel for not raising all the petitioners claims at the trial court level, and for not raising all the petitioners claims in the Superior Court even though in the courts opinion headed "Second Supplement to our opinion and order of June 27, 1997" it ordered all the petitioners claims be taken to the Superior court, this was not done As of the date of this petition the court has yet to respond to this P.C.R.A

The petitioner was represented by the following lawyers:

1.) Head Public Defender <u>Norman Callan</u>: Arraignment, then he became a judge in Blair County 2.) Assistant Head Public Defender <u>Randy Miller</u>: from preliminary through direct appeals 3.) <u>Terry Despoy</u> court appointed for P.C.R.A did amended P.C.R.A and oral arguement 4) <u>Stevt Passarello</u> was then appointed for approx six months 5). Then <u>Thomas Hooper</u> was appointed 6) Then <u>Don Siford</u> was appointed he handled the Evidentriary Hearing concerning exhibit 205 and filed a appeal in the Superior Court 7) Then <u>Mary Ann Probst</u> was appointed she filed a motion to have Mr. Siford appeal remanded for her review (denied) and a petition for allowance of appeal in the Supreme court. Hers is the only known address: 1701 5th Ave Altoona Pa, 16602

When the petitioner filed his P.C.R.A he did so with the understanding that he would be appointed a lawyer to amend his P.C.R.A by reviewing the petitioners case, incorporating any issues of merit. Because of this understanding when the petitioner filed his P.C.R.A there were issues he didn't know how to address so he decided to have his lawyer add these claims.

Mr. Despoy was appointed to represent the petitioner and he was made aware of the additional issues. Mr. Despoy said that he would add these additional issues to his amended P.C.R.A but failed to do so.

The petitioner wrote the court explaining the situation and the additional issues. The court responded that he would speak to Mr. Despoy and that no further action would be taken untill Mr. Despoy and the petitioner came to an understanding on what was to be raised. Mr. Despoy responded that he would be raising all the petitioners claims.

On Aug 29,95 oral arguments were held at this hearing Mr. Despoy told the petitioner that only the claims in his amended P.C.R.A could be argued but that when he filed his brief the additional issues would be raised. However this was not done, so the petitioner filed a 2nd P.C.R.A claiming ineffective assistance of trial counsel, and Mr. Despoy for not raising all the petitioners claims.

Because the petitioner was represented by counsel no action was taken on this P.C.R.A. However once again the court stated that no action was going to be taken untill a understanding was reached by the petitioner and counsel. Never-the-less the court on June 22, 1997 did set forth thier opinion and order. In this order the court dismissed all the petitioners claims except one, telling Mr. Despoy to further investigate this issue then bring his findings back to the court so a final ruling could be made on the petitioners P.C.R.A. In this opinion, the court also noted the petitioners desire to have all his claims heard. The court stated to solve this problem he would also rule on the P.C.R.A filed by the petitioner and they were dismissed.

This was a futile gesture because the court knew the additional issues were not on the petitioners original P.C.R.A. The petitioner wrote the court. The next response from the court was because of a conflict of interest the petitioner was being appointed a new lawyer. That being Mr. Despoy went into private practice with the D.A that was handling the petitioners P.C.R.A.

Mr. Hooper was appointed to represent the petitioner and once again the petitioner wrote the court about the additional issues the court responded that he would leave it up to Mr. Hooper as to what issues needed to be raised on behalf of the petitioner.

The petitioner made Mr. Hooper aware of the additional issues, and Mr. Hooper said that he would raise them but that he first needed to locate the petitioners trial records, transcripts and what not. This went on for approx two years. Mr. Hooper was unable to locate these things and the court told him that they would give him all the time he needed to find these things.

Mr. Hooper was the petitioners lawyer for approx two and a half years then because of a conflict interest (unknown) the petitioner was appointed a new lawyer. Mr. Siford was appointed to represent the petitioner. Not only did he make him aware of the additional issues but so did the court.

Mr. Siford said that he would raise these additional issues. Mr. Siford was able to locate eight of the petitioners jurors so a hearing date was set for March 21, 2003 so the issue that the court told Mr. Despoy to further investigate could be resolved.

At this hearing Mr. Siford attempted to raise the additional issues but the prosecution objected to this being done so the court said it would give them sixty (60) days to set forth thier position on having these issues heard.

-2-

On May 13, 2003 the court set forth thier opinion headed "Supplement to our opinion and order of June 27, 1997" in this order the court dismissed the unruled on issue, stating that this issue and the ones already dismissed in the order of June 27, 1997 should be appealed to the Superior Court. And that the additional issues not raised should be addressed in a second P.C.R.A.

Approx. two weeks later the petitioner received a new order undated headed "Second Supplement to our opinion and order of June 27, 1997" in this opinion the court stated that the petitioner could not file a second P.C.R.A and that if he did it was here by denied, that he agreed with the prosecution that the delay in reaching a final ruling on the P.C.R.A was not a open window for the petitioner to raise new issues, and that at the original hearing on Aug 29, 95, the petitioner waived his right to raise additional issues.

First the petitioner did not use this delay to raise additional issues the court was well aware of these issues from the beginning, and as far as the petitioner waiving his right to have additional issues heard. The only waiver made by the petitioner had to do with Mr. Despey who represented a prosecution witness at the petitioners trial, the petitioner waived any conflict of interest issue relating to that matter.

Never the less the court now ordered that these additional issues be taken to the Superior Court along with all of his other issues. However when Mr. Siford filed his appeal in the Superior Court not only did he fail to raise the additional issues, but he also failed to raise all the issues dismissed by the court on June 27, 1997.

He filed his appeal then withdrew as counsel for the petitioner. Mrs. Probst was appointed to represent the petitioner. She filed a motion to remand Mr. Sifords appeal so that she could review it, that was denied, in turn the petitioner was denied his constitutional right to appeal. The Superior Court only heard one of the petitioners claims.

The following issues were never litigated in any of the courts, and because the petitioner did every thing in his power to exhaust his state remidies concerning these issues the petitioner asks that this honorable court does not dismiss this writ because it contains unexhausted claims.

1.) The common wealths case was built solely on the results of D.N.A testing. it was said that the petitioners DNA was found on the left front pocket of the pants Mr. Lascoli had on when he was killed.

However after the petitioners trial, he obtained the DNA lab reports prepared by Life Codes and he discovered that the DNA found on Mr Lascoli's pants pocket said to be the petitioners was not detected as being human DNA, these reports also showed that the purple top tube of the petitioners blood was not detected as being human DNA.

The sole finder of facts the petitioners jury never was told that the DNA found said to be the petitioners was not human DNA.

2.) After the petitioners trial his lawyer Mr. Miller filed a motion to have the evidence impounded and inventoried this motion was granted and it was discovered that a purple top tube of the petitioners blood was missing

The sole finder of facts the petitioners jury was never told that a tube of the petitioners blood was missing

3.) At trial the common wealths DNA expert Lisa Banette, who did the DNA tests on the pants pocket where it was said the petitioners DNA was found testified the first thing she did to this pocket before any testing was take pictures of the pocket.

-3-

The sole finder of the facts the petitioners jury never saw these photos, for that matter Mr. Miller never looked at these photos and compared them to photos taken of this pocket from the crime scene.

4.) After the petitioners trial it was discovered from Mr. Miller that during the petitioners trial one of the petitioners jurors who was sequestered was having serious problems with her boyfriend so serious that the court was willing to replace her.

Mr. Miller and the court failed to let the petitioner know about this during trial. it was the petitioners right to be present when his jury was selected and he believes that it was his right to know about this problem at trial.

5.) After the petitioners trial David Houtz the petitioners brother and prosecution witness signed a affidavit giving insight into why he testified for the prosecution, how the Altoona police and Det. Cooper coerced him into lying, how not only was his testimony in general a lie but how he lied about not reaching a plea-bargin with the state for charges against for his testimony.

This affidavit is not standing alone, and many already known facts support the truthfullness of this affidavit.

Issues 1.) 2.) 3.) and 4.) as not to be repetitious will be further discussed in detail when presenting the rest of the petitioner claims because they go hand in hand. The petitioner asks that this Hon. Court concider these claims in whole, not at each issue by its self along with the following claims:

6.) Trial counsel Randy Miller was not of a sound state of mind while preparing the petitioners case, and to adequatly defend the petitioner and his constitutional right to a fair and impartial trial.

(a) Mr. Miller was faced with a conflict of interest that not only affected his state of mind but also directly affected his ability to unbiasly represent the petitioner. Mr. Miller and his wife at the time of the petitioners trial were having serious marital problems. Because of this his wife became vindictive.

In a letter date Dec 21, 97 Mr. Miller stated that he "never told the petitioner this" but his wife despised him working on the petitioner's case and would go out her way to make his work as difficult as she could many times even leaving him alone all day and late into the night with thier three young children, forcing him to go with out sleep to prepare for trial the next day.

(b) On top of this Mr. Miller was suffering from alcoholism. Mr. Miller was a alcoholic who drank heavily daily, who would be drunk while preparing for each days trial proceedings, and would even come to trial reeking of alcohol with a slurred speech.

Mr. Millers state of mind was clearly impaired, he had a life long obligation to his wife and a professional obligation to the petitioner. The emotional strain, burden and conflict this placed upon Mr. Miller had to be immense. Add to this Mr. Millers drinking problem (that lead to him preparing the petitioners appeals from a rehab) its illegal to drink and drive for a reason, people get hurt even die because the alcohol impairs thier ability to make sound decisions what is the difference between a drunk driver and a drunk lawyer. My life was in Mr. Millers hand the commonwealth was seeking death for the petitioner.

Because the petitioners P.C.R.A counsel failed to present this claim in his appeal, the Superior Court never heard this claim. How ever, at the commonwealth stage the court in dismissing this claim on the petitioners P.C.R.A stated that Mr. Millers drinking and personal problems standing alone had no bearing on his representation of the petitioner.

-4-

Unfortunately for the petitioner, what that court failed to do was weigh this against each of the issues of ineffectiveness of assistance of counsel that the petitioner raised against Mr. Miller to determine if the petitioner was prejudiced by this, would a lawyer of sound mind make the same decision.

The petitioner believes that it was his constitutional right to assistance of counsel, not just a warm body next to him, but effective assistance of counsel, one able to make sound decisions not clouded by alcohol, conflict of interest and emotional distress.

Because of Mr. Miller's state of mind the petitioner believes that he was denied his constitutional right to effective assistance of counsel and due process of law. And the petitioner asks that this Hon. Court does not look at this issue alone, but weighs this issue hand in hand with all the petitioners claims.

2.) Randy Miller was ineffective for failing to investigate and follow up on facts and leads that would have cast a major shadow of doubt upon the states case.

(a) The prosecutions case was built solely on the results of DNA testing done by Life Codes. The petitioners case was the first to use DNA in a criminal trial. its said that the petitioners DNA was found on the inside of the left front pants pocket of the pants Mr. Lascoli had on when he was killed.

The prosecution and police claim that the petitioners DNA got on this pocket from him stabbing Mr. Lascoli and the knife slipping and cutting his hand. With this cut and bleeding hand its said that he reached into Mr. Lascoli's front left pocket and took his wallet leaving his DNA on the pocket.

From there its said that the petitioner went to Prospect Park and discarded the cloths he had on 1 pair of multi colored shorts, 1 tank top, 1 yellow jacket, 1 smock, 1 gray button up sweater, 1 Penn State sweat shirt and one pair of jeans along with Mr. Lascoli's wallet that were all later found by the police.

DNA testing was not the first blood work done in this case. ABO blood typing was 1st. Really the Altoona police evidence custodian sent all the items to be tested to the crime lab.

A purple top tube of the petitioners blood was tested and said to be "human blood" type O, the most common blood type in the United States 45% of the population has it. Mr. Lascoli was said to have type B, only 10% of the population has it.

There was a blood type the same as the petitioners found on Mr. Lascoli's kitchen floor, however Mr. Lascoli's front left pants pocket was tested and only his blood type was found there.

Next it was decided that DNA testing was going to be done. Approx fifty-one (51) days after Mr. Lascoli was killed Det. Sassano took the items to be tested to his house kept them over night and the next day took them to Life Codes to have the DNA testing done.

At this time the pants Mr. Lascoli had on when he was killed were not taken to be tested. I believe the reason for this is that the crime lab only found Mr. Lascoli's blood type on this pocket, and Sgt. Epple one of the first Det. at the scene of the crime saw Mr. Lascoli's front left pocket turned inside out and saw no blood on this pocket.

The type O blood found on Mr. Lascoli's kitchen floor believed to be the petitioner could not be confirmed as being the petitioners DNA. However on one of the sweaters found in the park it was said that there was a mixture of the petitioners DNA and Mr. Lascoli's. However later prosecutions own DNA experts agree that the petitioners DNA was not on this sweater.

-5-

Everything tested at this time except the purple top tube of the petitioners blood was contaminated with large amounts of bacteria. This is what one would expect to find because the purple top tubes of the petitioners blood were taken from his arm at a hospital under sterile conditions and then kept refrigerated.

Approx. eighty (80) days after the first items were taken to have DNA tests done, and 132 days after Mr. Lascoli was killed it was decided that for some reason DNA tests were now going to be done on the left front pocket of the pants Mr. Lascoli had on when he was killed.

Det. Sassano took the pants to be tested to his house, kept them over night then the next day took the pants to Life Codes to have the DNA tests done. Det. Sassano told them to specifically test the left front pocket because he believed the petitioners DNA would be found on this pocket. DNA tests were done on this pocket and it was said that the petitioners DNA was found on this pocket.

However what was not found on this pocket was bacteria. Everything that was tested only 52 days after Mr. Lascoli was killed except the purple top tube of the petitioners blood was contaminated with bacteria. Yet these pants sat for 132 days and there was no bacteria on this pocket.

How is this scientifically possible, its not! There should have been bacteria on this pocket. How is it possible that if the petitioner reached into Mr. Lascoli's pocket with a bloody hand did he get his blood on the pocket and not the wallet that to take would have had it in his bloody hand, how is it that the petitioner took all these cloths off that were found in the park with this cut and bleeding hand but there was none of his blood on these clothing.

Why is it that when the crime lab tested this pocket only Mr. Lascoli's blood type was found there, yet when this pocket had the DNA tests done only the petitioners DNA was found. It could be argued that there were two stains. However Sgt. Epple said that he did not see any blood on this pocket, also when the crime lab did their ABO blood typing if a item had more than one stain they were all tested.

Why did Det. Sassano have any of this evidence at his house over night, this was not a established practice, had it been the Altoona Police would not have had a evidence room, and a evidence custodian. Had this been the rule and not the exception Sgt. Kelly would have also taken the evidence that was to go to the crime lab to his house and kept it over night but that did not happen.

If Det. Sassano truely believed that the petitioners DNA would be found on this pocket why wasn't this pocket the first thing to be tested.

Trial counsel was aware of all of these facts when Dr. DeForest told him that he could test the pants pocket for EDTA a substance placed in purple top tubes of blood to keep them from clotting. If EDTA would have been found on this pocket we would know why the purple top tube of the petitioners blood and the DNA found on the pants pocket were the only two items not to have bacteria on them, why the petitioners DNA was not found on the wallet or cloths in the park, why the petitioners blood type was not found on this pocket when the crime lab tested.

Trial counsel should have had Dr. DeForest test this pocket for EDTA but failed to do so. Also the additional issues must also be added to this. Not only was the DNA found on the pocket said not to have bacteria on it but it was not detected as human DNA. Then you have the purple top tube of the petitioners blood there was no bacteria in it and it was also not detected as human DNA. Then you also have the fact that a purple top tube of the petitioners DNA blood is missing.

(b) Given the above facts Mr. Miller should have investigated the photos taken by Lesi Bernette of the pants pocket be for any tests were done and compared them to crime scene photos

-6-

(C) The prosecution claims that the petitioner robbed Mr. Lascoli of his wallet then discarded it in the park. This wallet was found in a small tree in a somewhat torn up condition. The police and prosecution believe that it got this way from being run over by a lawn mower.

Mr. Lascoli's family testified at trial that approx. a month before he was killed he lost or had his wallet stolen, and that he liked to carry at least 200$ in his wallet and that at the time of his death he would have had about 260$.

The petitioner does not believe that Mr. Lascoli was robbed of the wallet found in the park. The petitioner believes that the wallet found in the park was the wallet lost or stolen before he was killed.

Mr. Lascoli was found with 9.05$ in his pockets and 200$ was found in his bedroom. If Mr. Lascoli liked to carry large sums of money why wasn't the 200$ in his wallet. If he lost his wallet and didn't get a new it would not make sence for him to carry large sums of money in his pocket but only what he was going to use the 9.05 found in his pocket.

Once again why wasn't the petitioners blood found on this wallet if he had it in his bloody hand?

There were pictures found in Mr. Lascoli's wallet one of Chris Houte that was discovered after trial was given to him at least a year before he was killed. if so then this wallet would have been the lost or stolen wallet.

There were also credit union cards found in Mr. Lascoli's wallet. Mr. Miller should have investigated when these cards were issued. if they were issued months before Mr. Lascoli was killed then we would know this wallet was not taken from him the night he was killed.

Det. Sassano testified that he spoke to the care taker of Prospect Park and he told him that he cut the grass where the wallet was found on or about the morning of June 7, 1988. Trial counsel should have investigated this because if this grass was cut anytime on June 7, or before June 7, this wallet found in the park that the prosecution claims was run over by a lawn mower could not have been taken from Mr. Lascoli the night he was killed because he was killed late on June 7, or very early June 8, 1988.

Proper and thorough investigation is key to any sound defense, and because counsel failed to investigate many key facts and leads the petitioner believes that he was denied his constitutional right to effective assistance of counsel and Due process of law.

3) Trial counsel was ineffective for stipulating to the chain of custody reports prepared by the State and police over night during trial. Than failing to go over these reports.

Because of this it was not discovered untill after the petitioners trial that a purple top tube of the petitioners blood was missing. Given the known facts counsel should have made the prosecution and police account for all of the petitioners blood.

Counsels stipulation and failure to go over these reports denied the petitioner his constitution right to effective assistance of counsel and due process of law.

4) Trial counsel was ineffective for failing to object to prejudicial, unsupported and false remarks made by the prosecution in his closing arguement.

(a) In the prosecutions closing he mislead the jury into believing that Commonwealth Exhibit #28 a brown handle lock blade

-7-

knife was found in the petitioners home, that it was the petitioners knife and it was the knife used to kill Mr. Lascoli.

First and foremost under "Brady" the prosecution in discovery had a duty to disclose to the defense any such evidence. However that was not done. Furthermore, the prosecution knowing misled the court to even have this knife introduced into evidence (see issue # 5)

The only witness to testify about this knife was Mr. Kawtoski a prosecution witness who was a electrician that was doing some electical work some time after Mr. Lascoli was killed in the apartment building where the petitioner lived along with his mother and aunt.

Mr. Kawtoski testified that while fixing the lights in the bathroom of apartment No. One (1) on the first floor he found commonwealth exhibit 28. The petitioner didn't live in this apartment or even on this floor the petitioner lived on the third floor in apartment No six (6).

There was no other testimony concerning where this knife was found, there was no evidence that suggested this knife belonged to the petitioner or that it was the knife that killed Mr. Lascoli.

(b) in the prosecutions closing he said that the petitioners DNA was found on Mr. Lascoli's kitchen floor. Not only was this misleading but a outright lie.

There is no conceivable or sound reason why Mr. Miller didn't object to these unsupported, false and prejudicial remarks made by the prosecution. The last thing the jury heard before they went out to deliberate unobjected to, was that this knife was the murder weapon, my knife and found in my home and that my DNA was found on his kitchen floor. What more did they need to convict?

Because counsel failed to object to these prejudicial, unsupported and false remarks made by the prosecution is his closing, the petitioner believes that he was denied his constitutional right to effective assistance of counsel and due process of law

5) Trial counsel was ineffective for failing to object to the commonwealth misleading the court to have commonwealth ex 28 introduced into evidence, and based on relevancy.

The prosecution asked to have com. wealth ex.# 28 a brown handle lock black knife introduced into evidence as testified to by states witness Melissa Oshea he believed. This was misleading, no false because the prosecution knew she didn't testify about this knife

This knife if the prosecution believed it was the murder weapon should have been disclosed as such in discovery, however it wasn't because the prosecution knew this knife could not be linked to the petitioner or the murder in any way.

This knife was used to inflame the minds of the jury and should have never been introduced into this case. Because counsel failed to object to it the petitioner believes he was denied his constitutional right to effective assistance of counsel and due process of law.

6) Trial counsel was ineffective for failing to object to prejudicial hearsay testimony presented by the prosecution.

-8-

David Houtz the petitioners brother and a prosecution witness testified that sometime after Mr. Lascoli was killed Melissa Oschea another prosecution witness called the house for the petitioner. Mr. Houtz said that he spoke to her and she told him on the night of the murder the petitioner called her and told her that he needed clean cloths.

Not only was this hearsay but false testimony (see issue 7) that the prosecution used to support its theory that the petitioner on the night of the murder discarded the cloths found in the sink and was in need of clean cloths.

There can be no sound reason why trial counsel failed to object to this prejudicial hearsay testimony. Because trial counsel failed to object the petitioner believes that he was denied his constitutional right to effective assistance of counsel and due process of law.

7.) Trial counsel was ineffective for failing to object to known false and perjured testimony presented by the prosecution and or failing to properly cross examine and impeach these witnesses.

(a.) David Houtz testified that Melissa Oschea told him that on the night of the murder the petitioner called her and told her that he needed clean cloths. Not only was this hearsay but a out right lie, all counsel had to do was question Ms. Oschea about it but he failed to do so.

The prosecution knew that not only was this testimony hearsay but false. The prosecution knew that if counsel objected to this because it was hearsay it would not have been allowed in. To avoid this all they had to do was question Ms. Oschea about this. She was a states witness who testified before Mr. Houtz she was not questioned about this.

She was not questioned because the state knew it was a lie and didn't want Mr. Houtz contradicted they needed this testimony and because it came from Mr. Houtz the state knew that the jury would most likely believe the petitioners brother.

Before trial Ms. Oschea was questioned by the police many times she gave three statements to the police, one later on the same day that Mr. Houtz gave his statement about the matter in question. Yet the police did not question her about it. Why because they knew it was a lie.

After the petitioners trial in a civil deposition Mr. Miller questioned Ms. Oschea about what Mr. Houtz said, and she said this was a lie.

(b.) David Houtz was asked at trial if any plea bargin was reached with the prosecution for his testimony regarding burglary charges he was facing at the time he testified against the petitioner. Mr. Houtz stated that there was no plea bargin reached, the prosecution also said that there was no deal.

Mr. Houtz was then asked if no plea bargin was reached how was he able to make bail while on parole. He stated that he was no longer on parole when he made bail.

At the time Mr. Houtz testified about being off of parole trial counsel had in his possession documents that showed Mr. Houtz was still on parole when he made bail. When Mr. Houtz was arrested for the new burglary charges he was placed in the county jail and unable to make bail because he was on parole. When he went to his preliminary hearing a plea bargin was reached and part of that plea bargin clearly allowed him to make bail.

At this preliminary hearing the district attorney (assistant) Mr. Sill, who was handling the petitioners case made a

-9-

appearance and had a sidebar with the assistant DA, judge and Mr. Houtz's lawyer. A plea-bargin was reached at this time but not signed entill after Mr. Houtz testified against the petitioner.

Mr. Miller was aware of these facts, because he had somebody at the hearing, and Mr. Houtz's lawyer told him that a plea-bargin was reached however Mr. Miller failed to impeach Mr. Houtz with these facts.

To further support these already known facts after the petitioner was convicted Mr. Houtz realized his lies played a rule in the petitioner being convicted. He signed a affidavit were he confessed his lies about the phone call, about being off parole and about not making a deal with the prosecution.

(C) Sometime after Mr. Lascoli was killed Timmy Bowling and Serena Henry went to the police station together to give a statement. They testified that on the night Mr. Lascoli was killed they were together riding around along with Timmy's brother Tommy Bowling and Tammy Ickes. Serena stated that when she dropped Tommy and Timmy off outside of Maria Pierce's house. She saw the petitioner standing outside of Maria's house with the multi colored shorts on that were found in the park.

(From approx. three(3) weeks prior to Mr. Lascoli being killed up to to about Four(4) days after Mr. Lascoli was killed the petitioner lived with Tommy Bowling and Maria Pierce who were boyfriend and girlfriend. All of the petitioners clothes were at thier place. Serena Henry was also Tommy's girlfriend she knew about Maria but Maria did not know Tommy was messing with Serena.)

Approx. two (2) weeks after Serena and Timmy went to the police station Serena went back on her own and gave a new statement. In this statement she stated that she lied in her prior statement, she now stated that she was not with Tommy and Timmy on the night of the murder and she did not see the petitioner with the shorts on. And that she only said these things because Timmy Bowling told her to.

The police knew that this new statement was the truth because they obtained her phone records and they showed she was on the phone talking to Tammy Ickes at the time she first said she was Tommy and Timmy.

In Det. Whites police report in order he states that he spoke with Serena and she gave her new statement first then she was confronted with the phone records that he stated corroborated her new statement.

However at the petitioners trial to discredit Serena Det. White testified that Serena did not come forward with the truth untill after she was confronted with the phone records. This was a lie intended to make Serena look bad who was a defense witness.

Det. White not only should have been confronted with his police report, but should have been questioned about why when the petitioner was arrested was Serena also arrested for hindering a police investigation and Timmy Bowling wasn't who still testified that he was with Serena riding around on the night of the murder when he knew this was a lie.

(d) Timmy Bowling testified that on the night of the murder he was with Serena Henry this was a known lie. Timmy also gave a statement to police stating that he knew Mr. Lascoli to say hallo to him, however at trial he stated that he never spoke to him and didn't even know what he looked like.

(e) Maria Pierce stated that when the petitioner got back to her house on the night of the murder it was about 12-12:30 Am and she knew for a fact that it was this time because she was watching the NBA championship game between the Lakers and Pistons

She stated that the petitioner was not there when the game started but came in while they were playing. Counsel had the TV program log from the TV station that showed this game was over at 11:57. If the petitioner was at her house while this game was on it places him there at the time he told police he got there 10:30 - 11:00 and before Mr. Lascoli was killed (some time from 12:00 on)

The court would not allow counsel to impeach Maria with this program log showing what time this game came on and went off. However counsel could have gotten this information in another way but failed to do so.

Maria stated that her mother introduced her to Mr. Lascoli as Patsy and that is the only name she knew him by. When asked how she learned of Mr. Lascoli's death she said that it was the day after it happened on the noon news. She said that Brandon Brooks (the news anchor) said that a man known to family and friends as Patsy was murdered. Maria stated that when she heard this she went into her bedroom where the petitioner was sleeping and woke him up and asked him if that was the Patsy his mother knew. She said that he said yes then rolled over and went back to sleep.

Brandon Brooks no longer worked for the TV station and a print out of the noon news shows that there was never a mention of the name Patsy.

When Maria gave her first statement to the police she was shown a picture of the shorts found in the park and asked if she knew what the petitioner had on the day the petitioner left her house and she said she could not recall.

After Timmy Bowling told Serena to say she saw me with the shorts on found in the park Maria gave a second statement to the police. In this statement she stated that when the petitioner left her house he had on the shorts found in the park but that when he came back he had on different cloths but she did not know what.

Why these shorts, why did Timmy tell Serena to say she saw me with these shorts on. Why didn't Maria recall that I had these shorts on when she first gave her statement to the police.

When the police first went to Prospect park they searched it for approx four hours and did not find these shorts. However when they returned they found these shorts in the same area that they first searched, in the open on top of a empty case of beer. And somebody put F.R on one side of the tag and Frank on the other side.

Somebody wanted these shorts to be found and not only linked to the petitioner but to the murder of Mr. Lascoli. The prosecution knew this is the way it looked so they tried to clean it up with David Riley.

(f.) David Riley testified that when the petitioner was in the detention home on Aug 17, 87, he recalled these shorts and as part of the intake process he is the one that placed F.R on these shorts.

Commonwealth exhibit 205 was used to support this it shows on the front page when the petitioner was taken to the detention home he had on a pair of shorts. However there was a page two to this detention home inventory sheet that was not produced at the petitioner's trial.

-11-

The second page of this inventory sheet was more specific about the shorts the petitioner had on, page one just said shorts however page two described the shorts as a pair of gray cut off sweat pants.

These were not the shorts that were found in the park, David Riley at that time did work in the detention but could not have put the F.R. on them. He may have put F.R. on the gray cut off sweat pants but there is no way he could have mixed up the two. A pair of multi colored shorts and a pay of gray cut off sweat pants.

David Riley lied for the prosecution (at the time he testified he no longer worked for the detention home but now he was a sheriff) and to further support this is the testimony and statement of another prosecution witness Melissa O'Shea who said she got the shorts found in the park for the petitioner for his Birthday. His Birthday is in Nov. the petitioner was in the detention home in Aug. The petitioner didn't even have these shorts when he was in the detention home.

(9) Two days after Mr. Lascoli was killed as part of the police investigation they spoke to the friends of Mr. Lascoli, one of those people being the petitioner's mother Chris Houtz. Det. Cooper is the one that spoke to her.

Det. Cooper being part of the juvenile division knew Mrs. Houtz because her son the petitioner was on juvenile probation and Det. Cooper knew the petitioner.

Det. Cooper found out from Mrs. Houtz that the petitioner had not been living at home for the past 3½ weeks that he had been staying with Maria Pierce and Tommy Bowling. Det. Cooper knew that this was a violation of the petitioner's juvenile probation.

The next day Det. Cooper went to Maria and Tommy's place and arrested the petitioner for a violation of his juvenile probation.

(Det. Cooper made it appear as though the petitioner was being arrested for the murder of Mr. Lascoli. Det. Cooper testified that he didn't do this, however when the petitioner was arrested he was not told what he was being arrested for, and in a statement that Maria gave she stated that once I was taken from her house she thought the petitioner had something to do with Mr. Lascoli being killed so she started to search her house for anything linked to the murder)

The petitioner was taken to the police station without his mother being notified and without his rights being read to him and interrogated about the murder of Mr. Lascoli for approx 6½ hours before being taken to the detention home.

The following monday the petitioner had a masters hearing to see if he would be released from the detention home the petitioner's lawyer at that time Ronald Hilliman told the petitioner and his mother that Det. Cooper told him that he (petitioner) was the prime suspect (No. 1) in the death of Mr. Lascoli and that he was going to try and keep the petitioner in the detention home so he knew where he was.

The petitioner was released from the detention home with the condition that he live with his mother.

(when the petitioner was released from the detention home him and his mother stopped at Maria's to get his cloths, but Tommy said that he had to come back and get them because Maria was washing them something she never did before. when he did get them he did not notice his shorts missing)

-12-

At the petitioners trial Det. Cooper said that not only wasn't the petitioner a suspect at the time he was in the detention home but that he did not tell the petitioners lawyer that he was and that he was not even at this hearing.

The petitioners lawyer at the time of the detention hearing was Ronald Hilliren, at the time of the petitioners trial he was the Mayor of Altoona and said he didn't want to get involved.

Counsel still could have called him as a witness, and got the transcripts from the hearing that would have shown that not only was Det. Cooper at this hearing but made a statement on record to try and get the petitioner kept in the detention home.

Det. Cooper also testified that he didn't know who brought forth the facts that lead to the petitioner being arrested for the violation of his juvenile probation, but the petitioners mother is the one that told him.

Because the petitioner had cuts on two of his left fingers, the prosecution wanted the jury to believe that the petitioner was left handed so Det. Cooper said that the petitioner was left handed and that he even saw the petitioner sign things with his left hand. This was a out right lie.

Many of the prosecutions key witnesses trial counsel knew before hand were were going to lie and counsel not only failed to object to this known false testimony but also failed to properly cross-examine and impeach them.

Cross-examination is key to establishing the facts and truthfulness of a witness and because counsel failed to do this the petitioner believes that he was denied his constitutional right to effective assistance of counsel and due process of law.

8) Trial counsel was ineffective for failing to call DNA experts to the petitioners Frye Hearing.

The petitioners case was the first in P.A. to use DNA in a criminal trial. The petitioners lawyer, the court nor the prosecution had ever handled a case involving DNA.

Counsel filed a motion to be able to hire DNA experts for this purpose and it was granted. Yet counsel failed to hire a expert. The prosecution on the other hand had two that testified at the petitioner Frye Hearing. Dr. McElfresh and Prof. Tracey.

Mr. McElfresh was the director of the company that did the DNA tests Life Codes, and Mr. Tracey was his college prof.

Life Codes was a business that made money from the DNA tests that they did. if thier test results were dismissed from being used this would hurt the business.

So no matter what Mr. McElfresh was not going to say something was wrong with the tests. Mr. Miller in fact did point out many short commings of the DNA however Mr. McElfresh talked around these things and made them appear meaningless.

In the end it was a decision that was going to be made by the court. To be or not to be, does the court rely on a DNA expert or a lawyer and that is what it came down to.

-13-

However had counsel called its own DNA expert not only would the court of had a all around opinion to base its ruling on, but Dr. McElfresh would not have been able to make the misgivings that Mr. Hiller did point out seem meaningless.

Not even a year before the petitioners case came about LifeCodes did DNA tests in the Castro case in New York. There the defense called its own experts to point out the misgivings of the DNA and the DNA was not allowed in.

LifeCodes was rebounding from that and the same errors that lead to the DNA not being allowed into that case took place here, unaccounted for bands, confusion with the control lang, tests that should of been done wasn't done not to mention the fact that LifeCodes lab reports do not dect the petitioner blood on the blood found on the pocket as human DNA.

Because counsel was no expert these things were over looked at the petitioners Frye hearing and had they not been, had counsel called a expert to his hearing as in the Castro the DNA would not have been allowed into the petitioners trial

Because counsel failed to call experts the petitioner was denied his constitutional right to effective assistance of counsel and due process of law.

9) Trial counsel was ineffective for failing to go over the exhibits that were to go out with the jury during deliberations.

Because of this commonwealth exhibit #205 unlawfully went out with the jury during deliberations, this exhibit no doubt inflamed the minds of the jury and prejudiced the petitioner.

It showed that as a juvenile the petitioner was placed in the detention awaiting trial for a robbery that was very misleading. When one hears robbery they think of violence and people being hurt. The petitioner was with a friend of his when his friend grabbed a wallet out of another juveniles hand and ran.

The jury did not know the facts they just saw that the petitioner was placed in the detention home for robbery. This exhibit was also very misleading in that it showed when the petitioner was placed in the detention home he had on a pair of shorts. And the prosecution wanted the jury to believe that these were the shorts found in the park that David Riley said he put the F.R. on, they only had the front page (see issue 7.(f))

Because counsel failed to go over the exhibits that were to go out with the jury the petitioner was denied his constitutional right to effective assistance of counsel and due process.

10). Trial counsel was ineffective for failing to inform the petitioner that during his trial one of the jurors was having serious problems with her boyfriend.

These problems were so serious and distracting to the juror that the court was willing to replace her. The petitioner believes as it was his right to be present when his jury was selected it was his right to be informed of this problem at trial to take part in the decision making. Because counsel failed to inform the petitioner of this he believes he was denied his constitutional right to effective assistance of counsel and due process of law.

-14-

11) The prosecution was in violation of prosecutorial misconduct for the following:

    a) Making unsupported, false and prejudicial remarks in his closing arguement to the jury. (See issue 7)

    b) The knowing use of false testimony and or failing to correct known and false testimony (see issue 7)

    c) Misleading the court to have commonwealth Ex 28 introduced into evidence and or failing to disclose to the defense in discovery that it was going to claim this knife was the murder weapon (See issues 5)

    d) For failing to go over the exhibits that were to go out with the jury during deliberations (see issue 9)

Because of the improper actions of the prosecution the petitioner believes that he was denied his constitutional right to due process of law.

12) The trial court was in error for failing to go over the exhibits that were to go out with the jury during deliberations.

Because of this commonwealth exhibit 205 unlawfully went out with the jury during deliberations. Denying the petitioner his constitutional right to due process of law.

The following issues were raised by trial counsel in his direct appeal and the petitioner believes had they been properly presented would have entitled the petitioner to a new trial.

1) The petitioner was unlawfully denied his constitutional right to a speedy trial.

The petitioner was arrested for the murder of Mr. Lascoli on July 18, 1988, however did not start trial until approx (21) twenty-one months later.

This delay was because the police made their arrest to take the heat off themselves, instead of the investigation first being done then an arrest made. The arrest was made first approx fourty-one (41) days after Mr. Lascoli was killed then the investigation done while the petitioner sat in prison.

The prosecution decided to use DNA and it was not untill Jan. of 1990 that the defense recieved all of the discovery pertaining to the DNA.

The petitioner had no control over this, but suffered awaiting trial, the thought of the death penalty that the prosecution was seeking looming over his head, by the time of trial the petitioner suffered from clinical depression and recurrent migraine headaches, and at least two defense witnesses could not recall facts that would have been helpfull to the defense.

Petitioners first lawyer filed a motion for a continuance of thirty (30) days from the time the defense got all of the DNA lab reports. This motion was granted. The prosecution argued that this continuance, went from the day the motion was filed untill thirty (30) days after all the reports were received, however the motion clearly shows this continuance was to take place after the defense got all the lab reports.

-15-

2) The petitioner was denied his constitutional right to due process when the prosecution knowingly used altered physical evidence.

Standard procedures of the Altoona Police were ignored when Det. Saccone took evidence to be tested for DNA to his house and kept them over night.

Namely the pants Mr. Lascoli had on when he was killed and a purple top tube of the petitioners blood. Before DNA tests were done also blood typing was done on the left front pocket of the pants Mr. Lascoli had on and only his blood type was found.

Next the DNA was done, but at this time 52 days after Mr. Lascoli was killed because the crime lab only found Mr. Lascoli's blood type on this pocket they were not sent for DNA testing. Every thing tested at this time except the purple top tube of the petitioners blood was contaminated with bacteria.

Eighty days later it was decided DNA tests would be done on the pants. Det. Saccone took them to his house and kept them over night then the next day took them to Life Codes and told them to test the pocket because he believed the petitioners DNA would be found.

Even though the crime lab only found Mr. Lascoli's blood type on this pocket, Life Codes now found the petitioners DNA on this pocket. However no bacteria was found.

The only way there could not have been bacteria on the blood found on the pocket is if it came from the purple top tube of the petitioners blood.

3) The petitioner was denied his constitutional right to due process by the admission at trial of unreliable and misleading scientific evidence.

Life Codes used DNA samples for testing that according to its own protocols should not have been used because they were a low quantity, or badly degraded.

Life Codes protocols says that anything outside of three standard deviations could not be called a match however ignored the protocol and called matches outside of three standard deviations.

Evidence developed at trial showed that Life Codes did not use the methods they claimed to be using such as the Elder-Southern equation, a microdensitometer to calculate the size of DNA restriction fragments and a spectrophotometer to measure the quantities of DNA purified. Life Codes in articles claimed not to do visual matching however they did here.

4) The petitioner was unlawfully convicted with the aid of evidence gathered that violated his constitutional right to prohibition of unreasonable searches and seizures.

Two days after Mr. Lascoli was killed the petitioner was arrested for a violation of his juvenile probation by Det. Cooper who had been assigned to check the hospitals for anybody being admitted for knife wounds.

-16-

Before the petitioner was taken to the detention he was taken to the police station and made two take off two band aids he had on two fingers of his left hand, with out his rights being read to him he was then interogated about the cuts, his relationship with Mr. Lascoli, where he was at when Mr. Lascoli was killed, if he did it over and over.

The answers about the cuts and what not were admitted into the petitioners trial after the petitioner took the stand.

5) The petitioner was unlawfully convicted with the aid of evidence gathered that violated his constitutional right against self incrimination

The petitioner as a juvenile, with out his rights being read to him or his mother being notified was questioned for approx 2½ by Det. Cooper and other Detectives and this was used against the petitioner at his trial.

6) The petitioner was unlawfully denied his constitutional right to confront adverse witnesses through cross-examination

a). The defense was not allowed to call upon the cell mate of Tommy Bowling to show that Mr. Bowling knew about bloody cloths and a knife stashed in his friends cell.

b) The defense was not permitted to confront Maria Pierce with a T.V. program log obtained from the T.V. station, that showed the NBA game she said she was watching at 12:30 was over at 11:37pm.

c) The defense was not permitted to confront Maria Pierce with an out line of the noon news obtained from the T.V. station that showed there was no mention of the name Patsy (see issue 7)

d) Defense was not permitted to cross-examine David Houtz about his motive for testifing for the prosecution and or helping Tommy Bowling hide clothing in prospect park

e) The defense was not permitted to question Tommy Bowling as to why he attempted suicide in 1989

f) The defense was not permitted to impeach Tommy Bowling with his prior inconsistent statements

g). The defense was not permitted to rebutt testimony of Det. Cooper that the petitioner was left handed

7) The petitioner was denied his constitutional right to affective assistance of counsel during direct appeal.

After the petitioners trial Randy Miller was fired from from the public defenders office and not because the petitioner was convicted but because the commissioners of Blair County did not want a alcoholic running the public defenders office

The Commissioners of Blair County told Mr. Miller if he did the petitioners appeals they would pay him and Mr. Miller agreed.

-17-

Part way through the petitioners appeals Mr. Miller asked to be paid for his work up to that point and the Commissioners refused to pay him. Mr. Miller then filed a law suit against Blair County and also a motion to withdraw from this case that was denied.

This gross conflict of interest is easily seen in the appeal work that Mr. Miller, and the Superior Court even made note of this in thier opinion and order.

The petitioner does not have any future sentences to serve after completing the sentence that is now under attack

The petitioner, James Franklin Rodgers declares under the penalty of perjury that the foregoing is true and correct to the best of my belief, information and knowledge.

James Franklin Rodgers
2-22-06

Wherefore, the petitioner prays that this Hon. Court, grant the petitioner a new trial, or remand his case back to the Superior Court so all of the petitioners claims could be heard or grant the petitioner a evidentiary to allow the petitioner to fully develop his allegations that are not fully supported by the state court record.

Respectfully Submitted,
James Franklin Rodgers
2-22-06